2025 IL App (1st) 231679
No. 1-23-1679
Opinion filed June 20, 2025

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 03358 01 |
| | ) | |
| KEANNA FORD | ) | The Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Tailor and Justice Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1    This case underscores the unreliability of memory and why contemporaneous recordings and court transcripts are indispensable in the pursuit of truth. A witness gave testimony years after an altercation that conflicted with statements he gave at a police interview recorded shortly after the incident. When trial counsel sought to use the recording, the trial court barred it without consulting the transcript of the witness's testimony. All this led to a jury convicting Keanna Ford of two counts of aggravated battery and rejecting her claim of self-defense.

¶ 2 On appeal, Ford argues that (i) the trial court erred by excluding evidence for use to impeach her landlord's trial testimony regarding who threw the first punch and (ii) trial counsel rendered ineffective assistance by failing to introduce that same evidence substantively. We agree that the excluded evidence should not have been barred and that counsel should have used rules evidence to admit the statement substantively. Therefore, we reverse the judgment and remand for a new trial.

¶ 3 BACKGROUND

¶ 4 Ford returned to the apartment building where she lived, wearing her Family Dollar uniform with a box cutter in her pocket. She was expecting to find a package that was not there, so she began knocking on neighbors' doors. This eventually led to an altercation, with the central issue at trial being who started the fight. The trial occurred nearly 3½ years after the incident.

¶ 5 State's Case

¶ 6 *Ivanhoe Hall*

¶ 7 Landlord Ivanhoe Hall, who was 90 years old at the time of trial, testified that he heard Ford talking loudly upstairs while he was working in a vacant second floor unit. Hall found Ford on the third floor, where she was complaining about a "stolen" package. After speaking with Ford, Hall returned to the vacant unit; Ford headed toward another unit on the second floor where Robert Collins was staying.

¶ 8 Hall witnessed an argument between Ford and Collins after Ford accused Collins of stealing her mail. "[B]efore long," the two were fighting. Hall claimed he "was pushed" into the vacant unit, after which he locked the door and called the police. At no time did Hall see Ford's son, Juwan.

¶ 9     During cross-examination, defense counsel asked Hall if he saw a man throw a punch. Initially, Hall answered that he "saw them fighting." A few questions later, Hall acknowledged telling detectives that he saw a man throw a punch but did not know if the punch he saw was the first one.

> "Q. So you did see a man throw a punch?
>
> A. I saw them when the fight started.
>
> Q. That man was fighting Keanna Ford, correct?
>
> A. Yes, sir.
>
> Q. And he threw the first punch, correct?
>
> A. I don't know if he threw the first punch but I know they were fighting.
>
> Q. Did you see him punch Keanna Ford?
>
> A. Well, they were just fighting like that.
>
> Q. Well, what I'm asking you is, did you see this man punch Keanna Ford?
>
> A. I don't know whether he punched her but his fists was going like that.
>
> THE COURT: Indicating with both hands a clenched fist, a pumping motion.
>
> [MR. HALL]: I saw them fighting that is all I can say."

¶ 10                     *Sergeant Joseph Mirus*

¶ 11    Sergeant Joseph Mirus, wearing a camera, arrived to find a woman yelling as she left the apartment building. Mirus entered to look for anyone injured and spoke with Hall. A portion of the video without audio was shown to the jury.

¶ 12    During cross-examination, defense counsel tried to introduce the full video of the conversation with Hall, including the audio. The State objected. While the court allowed a limited

portion to be played, it excluded the part containing Hall's statements to Mirus, prompting defense counsel to argue that the video and audio impeached Hall's testimony. The defense counsel explained that the video was significant because Hall's account on direct of who punched whom and when was equivocal. The court then reviewed the footage in chambers. In the video, this exchange takes place:

"[SERGEANT MIRUS]: Did you see how the fight started between the man and the woman outside?

[MR. HALL]: I believe what happened, I was here at the door because I heard them carrying on a whole lot of stuff outside this door, so I opened it. When I looked out there they had start fighting—apparently this guy came out who don't live in this building * * * he came out of the apartment and confronted this girl—the one hollering and screaming—and accusing him at the same time. He punched her—that was the first I saw of the fight. Then they got to fighting. And the people upstairs are kin to the people here and so they both came down and they both helped him fight."

Hall also said, "They was fighting so hard, and the man was giving the woman all he could give her. This guy right here was beating that woman like she was a dog."

¶ 13 The trial court sustained the State's objection, recalling that Hall's cross-examination focused on his recollection of an interview with a detective, not of the fight.

"THE COURT: The question was whether or not he talked to a Detective Lupo on 2/24/20 and whether you noticed he was taking notes, he indicated he wasn't aware whether or not he was taking notes and *didn't you say you saw a man throw a punch*; he demonstrated what he saw with his pumping fists and he did say to you he saw the man [throw] a punch, he doesn't know if it landed or what was going on. So you are talking

- 4 -

about a GPR that isn't this video so I'm going to strike that body worn camera of Sergeant Mirus, People—Defense No. 1 and tell the jury to disregard it as it's non impeaching and it's improper hearsay." (Emphasis added.)

After the court ruled, defense counsel stated they intended to call Mirus as a witness.

¶ 14                                            *Robert Collins*

¶ 15    Robert Collins testified that he was at his mother's second-floor apartment with his girlfriend, Sharae Moore. Collins heard someone at the door and answered. A woman (Ford) accused Collins of stealing a package. Collins became annoyed with Ford's yelling and screaming and shut the door in her face. When Collins later reopened the door to go to his cousin's apartment, he saw Ford speaking with Hall. Collins continued to his cousin's third-floor apartment. There, he, his cousin Lesha Bannister, and her significant other, Jywaun Thomas, smoked marijuana. (Jywaun Thomas will be referred to as Thomas; Ford's son, Juwan Thomas (no relation), will be referred to as Juwan.) A couple of minutes later, Collins left the apartment.

¶ 16    Collins saw Ford and her son leaving Ford's third-floor apartment. He proceeded downstairs and heard Ford say she was "going to have a mother f*** come kill [him]." Collins, who was 5 feet, 11 inches, and 190 pounds, ignored her and continued to his mother's unit. He reached the door and felt Ford put her index and second finger in a pointing gesture in the back of his head, saying she was going to "have a mother f*** kill [him]."

¶ 17    Collins turned around and told Ford he did not have what she wanted. He saw Juwan directly behind her. Collins and Juwan began fist-fighting. Juwan hit Collins in the face first. Bannister and Thomas came downstairs, and Bannister and Ford started fist-fighting. Thomas tried to pull Bannister and Ford apart. Eventually, Bannister and Thomas ran into Collins' mother's unit while Collins, Juwan, and Ford remained in the hallway.

¶ 18    Collins testified that Juwan put him in a chokehold while Ford struck Collins two or three times. Collins heard Ford say she was "going to get [his] a***" before putting a box cutter to his scalp.

¶ 19    The fight lasted five to six minutes. Collins said that at no point did Moore come out of his mother's apartment. Moore only "opened the door to see what was going on" and closed it. Collins denied Moore wielded a knife during the fight.

¶ 20    Collins conceded during cross-examination that he would not want Moore to get in trouble with the police. Collins acknowledged his criminal history, including a prior aggravated assault conviction and unlawful possession of a gun by a convicted felon. Collins denied living at the building in violation of section 8 housing regulations, testifying he was a visitor.

¶ 21                                        *Iesha Bannister*

¶ 22    Iesha Bannister, Collins's cousin, heard Ford "beating on the front door and cussing and fussing about some packages." When she heard Hall in the hallway, she opened the door and briefly spoke with him.

¶ 23    Collins came over, smoked marijuana with her and Thomas, and left. Collins did not appear angry or frustrated. After Collins left, Bannister heard thumping noises. Bannister did not know what Collins was doing in the hallway. But when she looked down the stairs, she saw Juwan putting Collins in a chokehold while Ford hit Collins. Bannister descended the stairs and said something along the lines of "what's up" or "what is going on." Ford replied, "[B]itch, you want some of this too." Ford took two steps towards Bannister, and the two swung and connected at almost the same time.

¶ 24    Thomas came down the stairs, threw a video-game controller at Juwan's head, and tried to pull Juwan off Collins. Soon, Thomas stopped trying to break up that fight and instead grabbed

Bannister and forced her into Collins's mother's apartment. Bannister saw through the peephole. Juwan held Collins in a chokehold while Ford took a box cutter to Collins's head saying, "[B]itch, you going to die today."

¶ 25    Bannister testified that no one else attacked Ford. She also denied that Moore was ever in the hallway.

¶ 26    Bannister had cuts on her stomach, according to Officer Ruben Vargas, who testified that he escorted Bannister to an ambulance. Ford ran up to Bannister, yelling something to the effect of "I should have killed you." Ford also received medical attention for scratches and was transported to the hospital because she was pregnant.

¶ 27                                  *Jywaun Thomas*

¶ 28    Thomas woke up to the sound of Ford banging on Bannister's door and yelling about a stolen package. Bannister opened the door and, speaking only to Hall, said they had no reason to steal a package and closed the door. Collins came upstairs, and they all smoked marijuana before Collins left.

¶ 29    Later, Thomas heard "banging and rumbling and a lot of hollering downstairs." Bannister said, "What are you all doing to my cousin?" before she "hopped" downstairs and confronted Ford. Thomas saw that Ford and her son had cornered Collins. Thomas denied throwing any punches. After he pulled Bannister out of the fight and into Collins's mother's apartment, he saw Ford approach Collins with a box cutter, saying, "B***, you are going to die today."

¶ 30    Thomas then used a back exit to call 911. Outside, he flagged down a patrolling sheriff and told him that his wife had been cut and needed an ambulance. Suddenly, Ford came running out towards him screaming with a butcher's knife and a crutch. In response, the sheriff then turned the taser toward Thomas, who ran away.

¶ 31                                                    *Deputy Thomas Sinks*

¶ 32     Deputy Thomas Sinks testified there was never a woman running at Thomas with a butcher knife and a crutch. Sinks chased Thomas when he fled but never attempted to taze him.

¶ 33                                                    The Defense

¶ 34     During the defense phase, Hall was unavailable to testify. Hall had notified the State that he had a doctor's appointment and was too exhausted to attend. The trial court decided not to continue the case for Hall's testimony, concluding that defense counsel had sufficient opportunity to cross-examine Hall, and found "[t]he exhibit * * * wasn't impeaching."

¶ 35                                                    *Keanna Ford*

¶ 36     Keanna Ford testified that Collins started the fight. She was weak and pregnant, having left work early that day due to an accident. When she got home, a package she was expecting was missing. She knocked on multiple tenants' doors and spoke with Hall. She showed Bannister and Thomas her phone, stating her package had been delivered. They replied that they did not see it.

¶ 37     Ford spoke with a first-floor tenant before returning to the second floor, where she encountered Collins and Hall. Collins was angry. Ford asked Collins if he saw a package with her name on it while Hall was still present. Collins responded, "[W]hy the f*** do [you] feel like it's okay to knock on people's door talking about a package?" Ford leaned back, looked at him, and called Collins a "b*** a*** n***" for that." Collins then punched Ford, who was pregnant, in the face "like [she] was a man" in front of Hall.

¶ 38     After Collins punched Ford, Hall closed his door. Collins grabbed Ford, choked her off her feet, and threw her against the wall. Ford saw Juwan throw a video-game controller at Collins, but Collins continued choking her. Juwan came downstairs and he and Collins began "tussling."

¶ 39     While Ford leaned over, gasping for air, Bannister and Thomas arrived. Bannister grabbed Ford's hair and started punching her with uppercuts. With her head down the whole time, Ford could not see but felt a bat-like stick going across her back. Scared for her life and feeling weak from her pregnancy, she could not fight back. To protect herself from the four people attacking her, she began swinging her blade to try to make them stop.

¶ 40     As the fight broke up, Ford saw Moore out in the hallway with a knife and a stick. Ford left the building and saw Thomas with a sheriff. Ford told the sheriff that she was three months pregnant and had just been jumped. Thomas took off running. Ford admitted that she was yelling and screaming outside after the fight because she was upset. Ford denied being angry about her package.

¶ 41                                      *Juwan Thomas*

¶ 42     Juwan Thomas testified that he was playing a video game in his mother's living room when he heard a commotion in the second-floor hallway. He went downstairs and saw a man choking his mother against a wall. He threw his video-game controller at the man and pulled him off his mother. He denied punching the man.

¶ 43     A woman wielding a knife emerged from a second-floor unit. Juwan began fighting the man and put him in a chokehold. The woman who had come out grabbed Ford and fought her. Two more people, a woman and a man, jumped down the stairs and started fighting him and his mother. The second man jumped on Juwan, and the other man punched him and threw his video-game controller back at him. In total, six people were involved. After Hall announced that he had called police, everyone dispersed.

¶ 44     Juwan sought treatment for cuts to his back. At the hospital, he initially told officers a fabricated story of being jumped and stabbed by random strangers at a bus stop. He pleaded guilty

to aggravated battery as a codefendant "to get out of jail" as he just had a son. He also had a 2019 prior felony conviction for not registering as a violent offender.

¶ 45                                        Verdict

¶ 46     The jury found Ford guilty of aggravated battery to Bannister and Collins. The trial court later sentenced Ford to 30 months in prison.

¶ 47                                        ANALYSIS

¶ 48     Ford contends that the trial court erred by excluding the body-camera footage of Hall's statements to officers, as it contradicts his trial testimony and is thus critical both for impeachment and as substantive evidence for the defense. We agree.

¶ 49                                      Impeachment

¶ 50     Out-of-court statements are considered inadmissible hearsay when offered to prove the truth of the matter asserted. See Ill. R. Evid. 802 (eff. Jan. 1, 2011). But a witness's out-of-court statement may properly impeach their in-court testimony (*People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 44), provided that the out-of-court statement is inconsistent with the trial testimony (*People v. Flores*, 128 Ill. 2d 66, 87 (1989)). Inconsistencies may include "a witness's evasive answers, silences, and changes in position [citation]; inability to recall [citation]; and omission of a significant matter that would reasonably be expected to be mentioned if true [citation] at trial." (Internal quotation marks omitted.) *Guerrero*, 2021 IL App (2d) 190364, ¶ 50.

¶ 51     The trial court determined that Hall's statements to police were consistent with his trial testimony and thus inadmissible. Generally, "[e]videntiary rulings are within the sound discretion of the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). A trial court abuses this discretion when its rulings are "arbitrary, fanciful, unreasonable, or where no reasonable person would take

the view adopted by the trial court." *Id.* After a careful review of the record, we find that the trial court abused its discretion.

¶ 52    During his testimony, Hall equivocated about whether Collins or Ford threw the first punch. But he was confident when speaking with Sergeant Mirus.

¶ 53    Hall testified that he saw Ford on the second floor accusing Collins of stealing her mail, and soon after, the two were in a "punching fight." Defense counsel asked Hall if he had told a detective that he saw the man throw a punch before Hall retreated into his unit, and Hall answered affirmatively. Despite this, a few questions later, Hall testified that he did not know if the man punched Ford or who threw the first punch, saying he "saw them fighting."

¶ 54    In cross-examining Sergeant Mirus, defense counsel sought to impeach Hall's credibility with Hall's prior statements captured on Mirus's body-worn camera. The video showed Hall telling officers that Collins punched Ford and described Collins as "giving the woman all he could give her *** beating [Ford] like she was a dog." The State objected on hearsay grounds.

¶ 55    The trial court sustained the State's objection by relying on its recollection that Hall testified "the saw the man throw a punch" but did not "know if it landed or what was going on." The court did not "find [the video] impeaching." But the record shows that, after providing equivocal answers, Hall testified, "I saw them fighting that is all I can say."

¶ 56    The trial court erred. *People v. Mitchell*, 152 Ill. 2d 274, 321 (1992) (finding error in denying motion to suppress by failing to recall defendant's testimony to officers). We reject the State's suggestion that the trial court could not have abused its discretion regardless of the ruling. A ruling that lacks record support is inherently unreasonable. See *People v. Heard*, 2021 IL App (1st) 192062, ¶ 19 (reversing conviction when trial judge expressly relied on misremembered witness testimony).

¶ 57    We also reject the State's contention that Hall's prior statements were consistent with his trial testimony. In the video, Hall told officers that (i) Collins punched Ford and (ii) the man "was beating that woman like she was a dog." These statements contradict Hall's testimony that he saw Collins' arms move in a punching motion. In the video, Hall tells officers that Collins was not only moving his arms but making contact by "beating that woman." Hall's recollection shifted from telling officers Collins punched Ford to unsure if Collins struck Ford.

¶ 58    In addition, we reject the State's repeated characterization of the record as Hall in his apartment "speculating" when the altercation began. In the video, Hall described the progression of the interaction between Ford and Collins. When asked if he saw how the fight started, Hall explained that "[Collins] came out of the apartment and confronted [Ford]." Hall said that Ford "was hollering and screaming at [Collins] so loud and accusing him at the same time." Then Collins "punched her, that was the first I saw of the fight." Hall's statements were based on visual observations, not speculation.

¶ 59    Likewise, a reasonable person could find Hall's trial testimony and his recorded statement, both about who threw the first punch, to be inconsistent with one another. Hall testified that he did not know whether Collins threw the first punch. But in the video, Hall said, "[Collins] came out of the apartment and confronted this girl — the one hollering and screaming — and accusing him at the same time. He punched her — that was the first I saw of the fight. Then they got to fighting." Inconsistencies include both a change in position and an inability to recall (*Guerrero*, 2021 IL App (2d) 190364, ¶ 50), both which Hall expressed while testifying.

¶ 60    Finally, we reject the State's claim that "at no point" during the video did Hall state that Collins threw the first punch. Hall described Ford first screaming in the hallway, followed by

Collins confronting Ford and then punching her. In Hall's words, Collins punching Ford "was the first [he] saw of the fight."

¶ 61                                    *Prejudice*

¶ 62    The State has the burden to demonstrate an error was harmless. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). Often, we apply a three-factor constitutional error test, but because the error here involves an evidentiary error, the "reasonable probability" standard applies. *In re E.H.*, 224 Ill. 2d 172, 180 (2006). Under this standard, the State must establish that no reasonable probability exists for an acquittal absent the error. *E.g.*, *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104.

¶ 63    We reject the State's assertion that the trial evidence overwhelmingly "established that [Ford] was the initial aggressor and did not act out of self-defense." The trial was essentially a contest between the State's witnesses (Collins, Bannister, and Thomas) and the defense's witnesses (Ford and Juwan). They provided starkly different accounts of what occurred.

¶ 64    In asserting that the evidence of Ford's guilt is overwhelming, the State highlights photos of cut wounds that Collins and Bannister sustained, along with Ford's actions and statements before and after the confrontation. Before the incident, Ford was yelling and banging on doors in search of her missing package. Afterward, Ford "appeared enraged" and made several statements, including profanity, about how she "tried to kill [Bannister]" and "cut everybody" when she "used [her] blade the way that b*** is supposed to be used." But that does not clarify whether Ford was the aggressor or responding in anger after being attacked by Collins, Bannister, and Thomas.

¶ 65    According to Ford and Juwan, Ford confronted Collins in the hallway about her package while Hall, and not Juwan, was present. Collins asked Ford, "Why the f*** do you feel like it's okay to knock on people's door talking about a package?" Ford replied by calling Collins a "b***

a*** n*** for that." Collins, at 5 feet, 11 inches, and 190 pounds, then punched pregnant Ford in the face, lifted her off the ground, and choked her before throwing her against the wall.

¶ 66    Juwan, hearing the commotion, came downstairs, saw his mother being strangled, and threw his video game controller at Collins. Juwan tried to pull Collins off his mother. Contrary to the State's assertion that Ford "was the only person with a knife," Juwan testified that a woman wielding a knife came out of Collins's mother's unit. As Ford leaned over to catch her breath, Bannister appeared, grabbed Ford's hair, and began uppercut punching Ford. Unable to see with her head down, Ford started to defensively swing her work-issued box cutter to fend off her attackers.

¶ 67    The State attempts to limit our focus to its narrative—that after Ford accused Collins of stealing, Collins denied it, Juwan hit Collins in the face, and both Juwan and Ford fought Collins. The State further claims that after hearing thumping noises, Bannister and Thomas came downstairs. Ford turned to Bannister, asking, "B***, you want some of this too?" before the two started swinging at each other. Thomas tried to pull Juwan off Collins after seeing Juwan put him in a chokehold. Thomas forced Bannister into an apartment before leaving and flagging a sheriff patrolling nearby. Meanwhile, in the hallway, Ford continued striking Collins and sliced his face with the box cutter while Juwan held Collins in a chokehold. Throughout the encounter, according to the State, Moore was never in the hallway and did not have a knife.

¶ 68    Given its narrative, the State suggests that *People v. Dickey*, 2011 IL App (3d) 100397, ¶¶ 4-11, should guide us. In *Dickey*, we found no rational fact finder could conclude that a victim lying on the ground created a danger to the defendant, who proceeded to continue hitting and kicking the victim. The State argues that Ford's continuing to strike and cut Collins while in a chokehold negates her claim of self-defense. But the State confuses the issue. In evaluating

whether any reasonable probability of acquittal existed absent the error, we must consider the totality of the evidence. The State's reliance on *Dickey* rests on unilaterally accepting Collins's testimony as true.

¶ 69    The jury's task was complicated because both Collins and Ford were impeached. Collins's prior convictions, questionable residency in the building, motive to protect Moore, and concession to smoking marijuana before the incident were all attacks on his credibility. Collins accused Juwan of initiating the altercation; however, Hall testified that he never saw Juwan in the hallway before Collins and Ford began fighting. Ford denied being angry about her package, while nearly every witness confirmed her banging on doors and yelling. The State also used photographic evidence of Ford after the altercation to challenge the credibility of her story, given the lack of visible neck bruising and other injuries.

¶ 70    The witnesses supporting Collins's version of events also had their credibility challenged. Bannister, Collins's cousin, admitted smoking marijuana on and off that day. Thomas claimed that Ford came outside after the altercation with a butcher's knife and crutch, screaming, and running toward him and a sheriff. That sheriff testified he never saw a woman with those objects to warrant Thomas fleeing.

¶ 71    Juwan's credibility was questioned when the State pointed to his prior felony convictions, dishonesty with police about how he received his injuries, and his guilty plea to aggravated battery for the encounter.

¶ 72    Nevertheless, we reject the State's argument. The testimony of Hall, a bystander who did not participate in the altercation, was critical. His testimony portrayed Ford as an instigator, roaming the halls and seeking a fight with whomever she encountered. Unimpeached, Hall's

testimony aligned with the State's narrative. The video, however, would have presented a far different perspective, with Collins "beating Ford like she was a dog."

¶ 73    A reasonable probability exists that the jurors would have found Hall's testimony less credible and deserving of less weight. See *People v. Miller*, 2017 IL App (1st) 143779, ¶ 42 (explaining how prior inconsistent statements raise doubt as to witness' truthfulness). The State predicates its argument by mistakenly asserting that "Hall did not see the inception of the fight" and that he "could not have provided any insight on who was the initial aggressor." As we discussed, the statements captured on the body-camera footage contradict that notion. We also reject the State's suggestion that seeing "Hall 'waiver' in real time" sufficed for jurors to assess his credibility. That Hall wavered while testifying differs materially from inconsistent prior statements.

¶ 74    Finally, we reject the State's characterization of the record that the video was duplicative or cumulative of Hall's testimony. Hall testified that he did not know if Collins punched first or even punched Ford. The purpose of the body-camera footage was to impeach Hall's credibility with prior statements that he saw Collins punching Ford first and saw Collins "beat[ ] her like a dog."

¶ 75    The impeachment, if admitted, was significant and contradictory. To have Hall impeached would have undermined the State's case. Considering all the evidence, the jurors could have found that Collins attacked Ford.

¶ 76    The State failed to prove that the trial court's error was harmless.

¶ 77                            Ineffective Assistance

¶ 78    Ford also argues that defense counsel provided ineffective assistance by failing to substantively offer Hall's prior statements either under the excited utterance exception or section

- 16 -

115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2020)). We agree with the latter basis for admission and address only it. See *People v. White*, 2011 IL 109689, ¶ 148 (noting courts should not decide issue if its resolution is unnecessary).

¶ 79    Trial counsel provides ineffective assistance where (i) their representation falls below an objective standard of reasonableness (ii) which prejudices the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We presume the trial counsel's decisions reflect sound trial strategy rather than incompetence. See *People v. Wright*, 111 Ill. 2d 18, 26-27 (1986). But we take the record as our guide and ask whether reasonably effective counsel, facing similar circumstances, would pursue a stated strategy. *Id.* The trial "counsel must determine the defense theory appropriate under the circumstances, including, of course, the law applicable under it." *Id.* at 27.

¶ 80    If we find that trial counsel erred, we ask whether a reasonable probability exists that the result of the trial would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome," and in making this determination, we consider the totality of the evidence before the jury. *Id.* at 694-95. Prejudice requires a showing that counsel's error deprived the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687.

¶ 81                                    *Section 115-10.1*

¶ 82    Ford argues that his counsel's representation fell below an objective standard of reasonableness by failing to offer Hall's statements as substantive evidence under section 115-10.1 of the Code. We agree.

¶ 83    The statute provides an exception to the rule against hearsay for substantively admitting certain prior inconsistent statements. 725 ILCS 5/115-10.1 (West 2020). An out-of-court statement becomes admissible if (i) the statement is inconsistent with the witness's trial testimony, (ii) "the

- 17 -

witness is subject to cross-examination concerning the statement," (iii) the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge," and (iv) "the statement is proved to have been accurately recorded by a *** videotape recording." *Id.* § 115-10.1(a), (b), (c)(2)(C).

¶ 84    Hall's prior statements to Mirus satisfied all of section 115-10.1's requirements. In reaching this conclusion, we reject the State's singular contention that "Hall's testimony did not contradict [his prior] statements," which were "cumulative" of his trial testimony. Hall's testimony (that he did not see who threw the first punch or if Collins's fist made contact with Ford) was inconsistent with the statements he gave police as depicted in the video (that Collins punching Ford was the first he saw of the fight and that Collins beat Ford "like a dog"). We need not repeat our discussion rejecting the State's characterizations of the record. Hall's statement to Mirus could have come in substantively as it met the remaining statutory requirements as well.

¶ 85    Failing to use the statute allowing prior inconsistent statements as substantive evidence can be the basis for a claim for ineffective assistance of counsel. *People v. Wilson*, 149 Ill. App. 3d 1075, 1079 (1986). Trial counsel must use all readily available sources of evidence to develop a sound defense. See, *e.g.*, *People v. York*, 312 Ill. App. 3d 434, 437 (2000) (failing to present available evidence to support defense constitutes ineffective assistance). This includes the duty to introduce evidence that would exculpate the defendant or corroborate his or her defense. *People v. Montgomery*, 327 Ill. App. 3d 180, 185-86 (2001) (collecting cases where counsel failed to investigate or present evidence).

¶ 86    Trial counsel acted objectively unreasonably by failing to introduce Hall's prior statements substantively. We reject the State's suggestion that this action be viewed as a trial strategy. The record reveals trial counsel's theory was that Ford acted in self-defense. Trial counsel challenged

the State witnesses about who punched first, called Ford to testify, and argued in closing that Collins initiated the altercation. Trial counsel recognized the importance of using Hall's prior statements, given how he had attempted to use them three times: during Hall's cross-examination, twice during Mirus's testimony, and when attempting to recall Hall to clarify his wavering inconsistencies. Trial counsel aimed to "flush out more issues of what he saw that day[,] after the testimony of the other [witnesses.]" After the denial of his attempts to use the statements for impeachment, the court asked, "[s]o is there anything else?" Trial counsel did not move to admit them substantively under the statute. Instead, he replied, "No."

¶ 87    As substantive evidence, the video statements would have carried more weight than impeaching evidence. The video statements would have corroborated trial counsel's theory that Ford acted in self-defense, providing favorable evidence for the defense, particularly since Hall, an independent, third-party observer, made the statements shortly after the altercation.

¶ 88    Our decision in *People v. Wilson* is instructive. In *Wilson*, when a witness' testimony was inconsistent with their prior statements, defense counsel did not attempt to use the 1984 version of the same statute to admit them substantively. *Wilson*, 149 Ill. App. 3d at 1077-1078. Instead, the trial counsel requested that the jurors be instructed to use the statements for impeachment purposes. *Id.* at 1077. We held that "[d]efense counsel's failure to recognize the substantive value of the prior statement and to utilize it" constituted ineffective assistance of counsel. *Id.* at 1079. We noted that "[t]he clear benefit of being able to use a prior inconsistent statement as substantive evidence is that it places such testimony on equal footing with the trial testimony, thus making it more persuasive in the eyes of the trier of fact." *Id.* Likewise, if trial counsel had introduced Hall's statement as substantive evidence, he could have employed those statements more extensively

during closing argument to emphasize that the record expressly supported Ford's theory of self-defense.

¶ 89    In reaching this conclusion, we reject the State's claim that trial counsel's adequate representation mitigates his deficient conduct. The State conflates the issues. Defense counsel's competent representation of Ford is expected under the Sixth Amendment and cannot serve as a buffer to excuse deficient performance in other aspects of counsel's representation. Despite trial counsel's competent cross-examination of State witnesses and timely objections and motions, they do not offset the objectively unreasonable conduct of failing to introduce Hall's statements as substantive evidence. We find that trial counsel's conduct fell short of the standard expected of an objectively reasonable criminal defense attorney familiar with the statutes governing evidence admissibility.

¶ 90                                     *Prejudice*

¶ 91    Lastly, trial counsel's error prejudiced Ford. Hall's statements provided greater benefit as substantive evidence than for impeachment purposes. See *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989) (noting, "value of the potentially impeaching material must be placed in perspective"). After the trial court's erroneous ruling, Ford's counsel failed to introduce the statements for impeachment purposes, leading to Hall's testimony remaining unchallenged.

¶ 92    Jurors had to rely on Hall's "wavering" testimony, which if Hall's prior statements had been admitted as substantive evidence, the jury would have been able to consider. Counsel's failure deprived Ford of an essential element of her self-defense argument. Hall's earlier statements supported and corroborated Ford's claim that she was not the initial aggressor, showing that the altercation began after Collins punched her.

¶ 93    We again reject the State's assertion that other evidence was so overwhelming that the outcome would have remained unchanged. By introducing Hall's prior statements, which indicated that Collins "beat Ford like a dog" and that his punch was the "first he saw of the fight," trial counsel could have placed the video on "equal footing" with the rest of trial evidence. This would have made the evidence "more persuasive in the eyes of the jury" than mere impeachment evidence would have been. See *People v. Zurita*, 295 Ill. App. 3d 1072, 1080 (1998) (citing *Wilson*, 149 Ill. App. 3d at 1078-79).

¶ 94    And we reject the State's argument that Ford was not prejudiced because some witnesses testified that she used disproportionate force against Collins. Again, the State selectively highlights the testimony favorable to their theory while ignoring the impeaching evidence against those witnesses, as well as the contrary testimony elicited by Ford and Juwan, and other evidence in the record. If Hall's statements had been considered as substantive evidence, the jury would have heard crucial information regarding the level of force used by Ford, demonstrating that it was reasonable in response to Hall seeing Collins first punching Ford.

¶ 95    Hall's statements would have bolstered Ford's claim that she was not the instigator while casting doubt on the State's theory, which relied on witnesses whose testimonies contradicted what Hall described in the video. This significantly affected Ford's defense and resulted in substantial prejudice. The outcome of the trial could have reasonably differed had trial counsel admitted Hall's statements for their truth.

¶ 96    Considering the totality of the evidence, the cumulative effect of these errors renders the result unreliable, depriving Ford of a fair trial under the standards enunciated in *Strickland*.

¶ 97    Reversed and remanded.

*People v. Ford*, 2025 IL App (1st) 231679

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-03358; the Hon. Thomas J. Byrne, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Myasar A. Ihmud, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian A. Levitsky, and Justin R. Kordys, Assistant State's Attorneys, of counsel), for the People. |