NOTICE

Decision filed 03/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241315-U

NO. 5-24-1315

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 20-CF-352 |
| | ) | |
| MELVIN TAYLOR, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE CATES* delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Sufficient evidence was presented by the State to affirm the defendant's convictions. The defendant has not established that defense counsel provided ineffective assistance during trial or during the defendant's sentencing hearing. The one-act, one-crime rule is not applicable where the elements of armed violence, involving two individuals, differ from the elements of home invasion.

¶ 2    After a jury trial, the defendant, Melvin Taylor, was convicted of home invasion, armed robbery, and two counts of armed violence, under a theory of accountability. He was sentenced to 25 years in the Illinois Department of Corrections (IDOC) and three years of mandatory supervised release (MSR). The defendant appeals his conviction and sentence and argues that the State failed to prove his guilt beyond a reasonable doubt; defense counsel was ineffective at trial and during

_____

*Presiding Justice Cates was not present for oral argument but has read the briefs and listened to the recording of oral argument.

1

sentencing; and his armed violence convictions should be vacated under the one-act, one-crime rule. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On the evening of November 12, 2020, Amanda Albright and Samantha Payne were staying at George Harrington's house. Everyone had fallen asleep in the living room, hours before Dontae Harris and the defendant entered the home carrying baseball bats. Harris used his bat to strike Albright in the face and Payne in the back of her head with the same bat. The defendant, while holding his own bat, searched Albright and Payne's pockets for money, and took $400 from Payne. Albright and Payne were subsequently airlifted to a hospital in St. Louis, Missouri for medical treatment.

¶ 5      The defendant was charged, by information, with four counts of conduct that he was accountable for or had committed. In count I, the State alleged that the defendant committed the offense of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)) for entering Harrington's home to intentionally cause injury to Albright and Payne. In count II, the State alleged that the defendant committed the offense of armed robbery (720 ILCS 5/18-2(a)(1) (West 2018)) where he was carrying a dangerous weapon, a baseball bat, and knowingly took property from Payne by use of force. In count III, the State alleged that the defendant committed armed violence (720 ILCS 5/12-3.05(a)(1) (West 2018)), while armed with a bludgeon, and struck Albright about the body and head with a baseball bat causing injury. In count IV, the State alleged that the defendant committed armed violence (720 ILCS 5/12-3.05(a)(1) (West 2018)) by striking Payne about the body and head with a baseball bat and causing injury.

¶ 6      The State submitted a motion *in limine* regarding the bad acts of the victims and sought to bar testimony related to the claims that the victims had stolen money. Harris, in a recorded

statement, claimed that he had attacked Amanda Albright and Samantha Payne because he believed that they had stolen money from his account. The State argued that there was no evidence that Albright and Payne had stolen money from Harris, and even if they had, Harris's purported motive did not create a defense for the defendant. The defense argued that the case against the defendant was based on a theory of accountability, and he should not be precluded from eliciting testimony regarding Harris's motivation for his actions. The circuit court denied the State's motion *in limine* as the information related to Harris's motive may have been important to a defense where the defendant was charged under a theory of accountability.

¶ 7 On October 25, 2022, the circuit court began the jury trial. After jury selection and opening statements, the State presented testimony from Albright regarding the events that occurred on November 12, 2020. Albright and her girlfriend, Payne, were visiting Harrington's house in Mt. Vernon, Illinois. Albright and Payne had fallen asleep on one couch and Harrington was asleep on another. Albright additionally testified that Dana Littlefield had been at the house that evening as well, but Albright did not know when Littlefield had arrived.

¶ 8 Albright woke up when she heard the sound of the front door opening. Albright then saw a baseball bat swing towards her face and heard a sound from the impact of the bat which shattered her facial bones. She was struck approximately 8 to 12 times by Harris's baseball bat. Albright testified that the defendant held a bat as well but did not swing it, and she added that "he didn't help me either." Albright recounted that Harris was "screaming" at the defendant to "empty that b*** pockets." Then, the defendant emptied Albright's pockets, which contained "a pot bowl and not even enough pot to load it and maybe a penny."

¶ 9 An ambulance was dispatched to Harrington's house, and that evening, Albright was taken by helicopter to St. Louis, Missouri for treatment. Albright suffered 17 skull fractures, and she

3

testified that "they removed my nose out from under my retina and severed my retina. I spit teeth across the floor." She became "100 percent blind" in her left eye.

¶ 10   A drug test was administered when Albright received medical treatment. Albright had tested positive for methamphetamine, amphetamine, fentanyl, marijuana, and alcohol. Albright acknowledged that she was under the influence of alcohol that evening, and that she had struggled with a methamphetamine addiction. Albright had used methamphetamines the day prior to the incident, but not the day of the incident.

¶ 11   After Albright received medical treatment, she participated in a photo lineup administered by the Mt. Vernon Police Department. Albright identified the defendant and Harris as the offenders in the photo lineup. Albright additionally testified that she had recognized the defendant when he entered the house because they met the day before the incident. She recalled that the defendant wore "looser dreadlock braids." Albright also identified the defendant in the courtroom and was certain that he was the same man who had searched her pockets.

¶ 12   Samantha Payne testified that she was at Harrington's house on the night of November 12, 2020, with Albright and Harrington. She had fallen asleep on the couch at approximately 8 p.m. and woke up to the sound of Albright screaming. She saw Albright on the floor, and the defendant and Harris were standing in the living room holding bats. Payne had met Harris and the defendant a few times the week prior to the incident. She identified the defendant as one of the men standing in Harrington's living room with a baseball bat in his hand.

¶ 13   Payne testified that she stood up after she saw Albright on the floor. Harris then swung his bat towards Payne, who was able to avoid being struck directly in the face with the bat because she turned away. Instead, the bat struck the back of Payne's head. Payne testified that her ears began to ring, and she felt someone go through her pockets. Payne additionally testified that she

4

saw the defendant go through her pockets. She had over $400 from her paycheck in her pants pockets that she had cashed the day before the incident. After the defendant went through her pockets, her money was gone. She also testified that the defendant did not hit her.

¶ 14    Payne had been drinking earlier in the day with Albright but was "a hundred percent sure" that the defendant was the one who went through her pockets. After she received treatment for her head injury, she was interviewed by the Mt. Vernon police. Payne identified the defendant and Harris in separate photo lineups.

¶ 15    On cross-examination, Payne testified that she had fallen asleep at 8 p.m. and the incident occurred at approximately 11:30 p.m. Harrington did not have electricity on at the house, but there was candlelight. She was able to see the defendant's face and identify that he was holding a baseball bat. Payne acknowledged that she finished a "half of a fifth bottle" of alcohol in the afternoon. She denied being intoxicated when Harris and the defendant arrived because she had been asleep for hours after she stopped drinking.

¶ 16    After the incident, Payne was flown to St. Louis, Missouri for medical care. She received stitches on the back of her head. The clothes that Payne wore to the hospital were lost when she received treatment. Payne also testified that the bag that she had with her at Harrington's house was gone when she attempted to retrieve it.

¶ 17    Carla Schnicker testified that she was a friend of Harrington. On November 12, 2020, at approximately 11:30 p.m. or 12 a.m., Schnicker was sitting in her truck that was parked in Harrington's driveway and eating a snack. She saw "a couple black males" with "clubs or bats in their hands" enter a small vehicle with Littlefield. After they drove away, Schnicker opened the door to her vehicle and she heard Albright screaming. Schnicker called 911, but she did not enter the house.

5

¶ 18 Littlefield testified that Harrington was married to her cousin, and she was staying in a room at Harrington's house. She had met Harris approximately a month before the incident, but she was not as familiar with the defendant.

¶ 19 On the evening of November 12, 2020, Littlefield was sleeping in her room, and she woke up to "a bunch of screaming and cussing." When she opened her bedroom door the defendant and Harris approached her and said, "You did it" and she was told to get her "things." Littlefield complied and left with Harris and the defendant. The house did not have electricity but there was enough light to see because of a lit candle in the living room. Littlefield saw Albright on the floor and Payne was standing on the couch.

¶ 20 Littlefield could not recall if the defendant and Harris had weapons because it was dark and "it was crazy." The defendant drove Harris and Littlefield to another house, and she was "one hundred percent" certain that the defendant was the driver. Littlefield additionally testified that after they were dropped off, Harris searched Littlefield's purse because "I guess he had money missing." Littlefield never saw the defendant again, before the trial.

¶ 21 On cross-examination, defense counsel questioned Littlefield about an incident involving Albright and Payne concerning a transaction on Harris's debit or credit card. Littlefield testified that Harris had been at Harrington's house earlier in the day on November 12, 2020. Albright had told Harris that she did not have a jacket, and Harris offered to buy her one. Harris had asked Littlefield to call the number of a financial institution to find out how much money he had available. Littlefield tried to place the call, but she accidentally entered the wrong number. Harris advised her that it was unnecessary to call back. Defense counsel asked Littlefield if Albright or Payne had mentioned if the incident occurred because Harris had a problem with his bank account.

Littlefield was unaware because she had not spoken to Albright or Payne after the incident. Littlefield was the last witness of the day.

¶ 22    On October 26, 2022, before the trial resumed, the defense presented a motion for payment of witness' travel expenses for Darren Disroe. The defense argued that Disroe was an essential witness for the defense to provide a foundation for the admission of a video of Albright. Disroe had recorded a video of Albright with his cell phone. On the video, Albright stated that she had been attacked by Harris and Disroe asked Albright if the defendant had anything to do with the attack. Albright said "no." Albright additionally agreed with statements made by Disroe, including that the defendant was "falsely accused of a crime by giving someone a ride," he "didn't know what the guy was going to do when he got inside," and that the defendant "was not guilty of any crime."

¶ 23    The State summarized the video recording of Albright and argued that Albright's trial testimony was consistent with the video. Albright had testified that Harris had attacked her with a bat and that the defendant never struck her. Additionally, the State argued that the defense could not call a rebuttal witness to impeach Albright without first questioning Albright on whether she made inconsistent statements. Rather than paying for witness travel fees, the State sought to disqualify Disroe as a rebuttal witness for the purpose of impeachment of Albright.

¶ 24    The defense argued that the video was an independent substantive defense exhibit. The circuit court found that the defense should have confronted Albright regarding her statement made to Disroe and the video was otherwise inadmissible. The circuit court denied the motion to pay for travel expenses for a witness if the evidence the defense was seeking to introduce through the witness was inadmissible.

7

¶ 25    The trial resumed and the State presented testimony of Coltin Crawford with the Mt. Vernon Police Department. Crawford testified that on November 17, 2020, he conducted independent photo lineups with both Payne and Albright. Crawford was not involved in the investigation. The lineups were conducted separately, and Payne and Albright did not speak to one another about the lineups before they were shown to them. Both Payne and Albright were able to identify the defendant and Harris in the photo lineups.

¶ 26    Braden Kelley, a Patrol Corporal employed by the Mt. Vernon Police Department, testified that the defendant and Harris were identified as the suspects in the home invasion. Kelley interviewed the defendant on November 14, 2020. The defendant told Kelley that he went to the home with Harris and was present during the incident. The State rested after Kelley's testimony concluded.

¶ 27    The defense moved for a directed verdict in favor of the defendant. The circuit court denied the motion. The defendant did not testify on his own behalf, and the defense rested.

¶ 28    After closing arguments, the jury found the defendant guilty on all counts. The defendant filed a motion for a new trial, which the circuit court denied.

¶ 29    At sentencing, the circuit court addressed the sentencing ranges the defendant faced. The State explained that the one-act, one crime rule was not applicable because the charges had different elements, and that the two armed violence counts involved separate victims. Defense counsel agreed.

¶ 30    After the circuit court addressed the sentencing ranges, a few amendments were made to the Presentence Investigation Report (PSI). The amended PSI indicated that the defendant was born July 29, 1957, and that he had been diagnosed and treated for prostate cancer in 2013 but was in an "acceptable state of physical health." The defendant's criminal history began in 1976, and he

was convicted and sentenced to the IDOC on several charges that occurred in the 1980s and 1990s. In 2004, the defendant received probation on a drug related offense, but his probation was revoked. He was subsequently sentenced to two years in the IDOC. His probation performance was classified as "poor" on the PSI. His criminal history additionally included a three-year sentence in the IDOC from 2005, and an 18 month sentence from 2007. In 2009, the defendant was sentenced to 76 days in jail on an aggravated unlawful use of weapon charge. In 2013, the defendant was found guilty of aggravated battery with great bodily harm. The circuit court indicated that it would consider the amended PSI and had "read it more than once."

¶ 31    The State presented evidence in aggravation. Detective Robert Kane with the Mt. Vernon Police Department testified to his investigation and the defendant's involvement with the home invasion. Kane had interviewed Harrington who had died a few weeks before the trial. The defense objected to testimony regarding statements by Harrington who was unavailable to testify. The circuit court allowed hearsay statements at the sentencing hearing and Kane proceeded to testify to information received from Harrington's interview. On the night of the home invasion, Harrington had been asleep. He awoke to a noise and saw two "dark figures" with baseball bats. Albright was on the floor sobbing and Payne was on the couch. Harris was shouting, "Where's my money" and was swinging his bat. Harrington had been struck with a bat, and he was hospitalized for his injury. Harrington was unaware of the defendant's name. On cross-examination, Kane testified that Harrington was unable to identify the defendant in the photo lineup.

¶ 32    Kane had also interviewed Harris. Harris told Kane that the defendant was with him during the incident. The defendant was Harris's driver that evening.

¶ 33    After Kane testified, Albright presented her victim statement. She blamed Harris for her injuries and did not think that the defendant deserved to be incarcerated for the rest of his life.

9

However, she thought that the defendant's actions were wrong and that he should have stopped Harris. Albright stated that she was "sorry for whatever happens to [the defendant] because I feel like [the defendant] tried to be nice about it," and that Harris had screamed at the defendant.

¶ 34    Defense counsel then presented evidence in mitigation and referred to the trial transcript. Defense counsel noted that Albright's trial testimony was consistent with her victim impact statement. She had testified that Harris screamed at the defendant to "flip that b*** over" and the defendant did "carefully." The defendant "carefully emptied" Albright's pockets. Defense counsel argued that the defendant never hit Albright with a bat. The defense did not present further evidence or testimony.

¶ 35    The State's argument addressed the defendant's criminal history that involved multiple felonies, including two armed robberies. The State requested a total sentence of 57 years.

¶ 36    Defense counsel then addressed the PSI again and clarified that the defendant did not have a previous armed robbery conviction. The circuit court reviewed the PSI again and agreed with the defense regarding the defendant's criminal history. Defense counsel then argued that the defendant did not personally cause injury to a victim. Harris immediately attacked the occupants after they entered the home while everyone was sleeping and before he could be stopped. The defense acknowledged that the defendant was convicted based on a theory of accountability but emphasized that Harris had been out of control. Defense counsel additionally argued that the defendant was 65 years old and requested a minimum sentence on each count to run concurrently for a total of six years in the IDOC.

¶ 37    The defendant made a statement in allocution where he stated that he was sorry for what had happened but denied being in the house. He claimed that he had only given someone a ride and that "I hope God forgive[s] you *** because this is all totally a lie against me."

10

¶ 38 The circuit court considered the evidence presented at trial and during the sentencing hearing, along with the PSI, the defendant's statement in allocution, and arguments of counsel. The circuit court noted that the defendant had a criminal history where he spent several terms in the IDOC and considered that a sentence was necessary to deter others from committing the same crime. The circuit court found that great bodily harm was caused to Albright and Payne. In regard to count I, the circuit court found that Albright had suffered severe bodily injury as she had lost an eye, teeth, and continued to suffer from the trauma. The circuit court did not make a severe bodily injury finding for count II regarding Payne's injuries.

¶ 39 The circuit court considered that the defendant did not personally strike Albright or Payne and gave little weight to the defendant's statement in allocution. The circuit court noted that the defense did not advocate for any factors in mitigation, and the circuit court did not find any applicable factors upon its own review. The defendant was sentenced to 15 years for home invasion and 10 years for armed robbery, to be served consecutively based on the severe bodily injury finding in count I. He was additionally sentenced to two concurrent terms of seven years for the two armed violence charges.

¶ 40 After sentencing, the defendant filed a "motion of appeal *pro se*" and included a letter to the circuit court where he raised claims of ineffective assistance of counsel. The Office of the State Appellate Defender (OSAD) represented the defendant on appeal in *People v. Taylor*, 2024 IL App (5th) 230217-U, which was remanded, *sua sponte*, for the limited purpose of a *Krankel*[1] inquiry. We retained jurisdiction to consider the issues raised on appeal.

¶ 41 The circuit court held the *Krankel* inquiry on November 12, 2024. The defendant claimed that defense counsel did not sufficiently communicate in preparation for trial, and had not

---

[1]See *People v. Krankel*, 102 Ill. 2d 181 (1984).

subpoenaed witnesses, and failed to question Albright about a cellphone video where she asserted that the defendant had nothing to do with the crime.

¶ 42 Defense counsel testified at the preliminary *Krankel* inquiry that he had met with the defendant several times and reviewed discovery with the defendant. He had considered the witnesses who the defendant requested be subpoenaed and found that some of the witnesses would not assist in the defendant's defense. Defense counsel had subpoenaed Darren Disroe, and Disroe refused to appear without compensation for travel expenses. Defense counsel then filed a motion requesting travel expenses and the motion included an argument concerning the admission of a cellphone video. The circuit court found that the defendant's claim regarding defense counsel's actions at trial was without merit. This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44 The defendant argues that there was insufficient evidence to support his convictions, counsel was ineffective during trial and at sentencing, and that the one-act, one-crime rule should apply to his armed violence convictions. These same issues were raised, and not addressed, in *Taylor*, 2024 IL App (5th) 230217-U, as the case was remanded for a preliminary *Krankel* inquiry.

¶ 45 When reviewing a sufficiency of the evidence challenge, we consider all of the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the crime. *People v. Daniels*, 2025 IL App (1st) 230823, ¶ 17. The trier of fact has the responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Where a finding is not against the manifest weight of the evidence, a reviewing court will not substitute its judgment for that of the trier of fact or retry the defendant. *Daniels*, 2025 IL App (1st) 230823, ¶ 17.

12

¶ 46　A defendant is accountable for another's crime when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2018). "Accountability focuses on the degree of culpability of the offender and seeks to deter persons from *intentionally* aiding or encouraging the commission of offenses." (Emphasis in original.) *People v. Perez*, 189 Ill. 2d 254, 268 (2000).

¶ 47　To prove that a defendant possessed the intent to promote or facilitate the crime, the State must prove, beyond a reasonable doubt, that the defendant shared the criminal intent of the principal, or that there was a common criminal design. *Perez*, 189 Ill. 2d at 266. Intent is typically proven circumstantially, absent direct evidence, and "a conviction may be sustained on circumstantial evidence alone." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 10. A common purpose or design can be inferred from the circumstances surrounding a group's actions, even without an explicit agreement. *In re W.C.*, 167 Ill. 2d 307, 338 (1995). Accountability may be established even without evidence of a defendant's direct participation in the criminal act through knowledge of and participation in a criminal scheme. *In re W.C.*, 167 Ill. 2d at. 338.

¶ 48　The defendant challenges his home invasion, armed robbery and armed violence convictions. To convict the defendant of home invasion pursuant to 720 ILCS 5/19-6(a)(2) (West 2018), the State was required to prove that the defendant knowingly entered the dwelling place of another without authority when he knew that at least one person was present and intentionally caused injury to any person within the dwelling place. The key consideration is whether the defendant intended to commit a criminal act. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 29. The Illinois Supreme Court explained that,

> "No individual who is granted access to a dwelling can be said to be an
> authorized entrant if he intends to commit criminal acts therein, because, if such

13

intentions had been communicated to the owner at the time of entry, it would have resulted in the individual's being barred from the premises *ab initio*. [Citation.] Thus, the determination of whether an entry is unauthorized depends upon whether the defendant possessed the intent to perform a criminal act therein at the time entry was granted. [Citations.] If *** the defendant gains access to the victim's residence through trickery and deceit and with the intent to commit criminal acts, his entry is unauthorized and the consent given vitiated because the true purpose for the entry exceeded the limited authorization granted. Conversely, where the defendant enters with an innocent intent, his entry is authorized, and criminal actions thereafter engaged in by the defendant do not change the status of the entry." *People v. Bush*, 157 Ill. 2d 248, 253-54 (1993).

¶ 49 The defendant argues that the State did not prove that the defendant entered the home without authority. The evidence adduced at trial demonstrated that the defendant entered Harrington's home carrying a baseball bat while all of the occupants were sleeping. None of the four occupants of the home testified that they were expecting guests or had invited Harris or the defendant. Furthermore, Harris attacked the occupants immediately after entering the home. The defendant proceeded to rifle through the pockets of two injured individuals before fleeing. The evidence sufficiently established that the defendant was not an authorized entrant of Harrington's home, and the State had proven the elements of home invasion beyond a reasonable doubt.

¶ 50 For an armed robbery conviction, the State must prove that the defendant committed robbery, by knowingly taking property from a person by force or by threatening the imminent use of force, and he was armed with a dangerous weapon other than a firearm. 720 ILCS 5/18-2 (West 2018). The defendant claims that the State did not prove armed robbery beyond a reasonable doubt where there was insufficient proof that Payne's property was taken where Payne was not a credible witness.

¶ 51 The jury was able to consider whether Payne was a credible witness. Payne acknowledged that she was drinking earlier in the day but was not intoxicated during the incident. Payne testified that she had received a paycheck the day before the incident and the remaining $400 was in her

14

pants pocket. She required medical care and lost her pants at the hospital and the property that she left at Harrington's house was gone when she returned. However, Payne also testified that she saw and felt the defendant search her pockets. After the defendant went through her pockets, she had nothing left. Sufficient evidence was presented to establish that Payne had $400 and that the money was taken by the defendant from her pocket before she lost her clothes and other property.

¶ 52     The evidence was sufficient to establish armed violence convictions (720 ILCS 5/12-3.05(a)(1) (West 2018)) under the theory of accountability where great bodily harm or permanent disability or disfigurement was caused during the commission of the battery. Both Albright and Payne suffered significant injuries after being bludgeoned with a baseball bat. Although the testimony reveals that the defendant did not personally strike Albright or Payne, sufficient evidence was presented by the State for the jury to conclude that the defendant shared the criminal intent of Harris. Multiple witnesses testified that the defendant was armed with a baseball bat when he entered the home. The defendant also participated in the criminal scheme by searching Albright and Payne's pockets after they were injured, and by driving Harris to and from the crime scene.

¶ 53     We reiterate that we will not substitute our judgment for that of the trier of fact or retry the defendant. *Daniels*, 2025 IL App (1st) 230823, ¶ 17. After considering the evidence in the light most favorable to the State, we find that the trier of fact could have found, beyond a reasonable doubt, the essential elements of each of the defendant's convictions.

¶ 54     A criminal defendant has a constitutional right to effective assistance of counsel at all critical stages of the criminal proceedings as guaranteed by the sixth amendment. *People v. Brown*, 2017 IL 121681, ¶ 25. This includes sentencing proceedings. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). Claims of ineffective assistance of counsel are governed by the familiar two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a

15

claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44. Both prongs of the *Strickland* test must be satisfied. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 55    "An ineffective-assistance-of-counsel claim which arises from a matter of defense strategy will not support a finding of ineffective representation." *People v. Smith*, 177 Ill. 2d 53, 93 (1997). Mistakes in strategy may not result in ineffective assistance as a defendant is not entitled to perfect representation. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). The decision to cross-examine or impeach a witness is considered a matter of trial strategy. *Smith*, 177 Ill. 2d at 92.

¶ 56    To demonstrate that the defendant suffered prejudice, "the defendant must show that, 'but for' counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). Prejudice cannot be proven by mere conjecture or speculation under *Strickland*. *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 102. "In order to establish prejudice from trial counsel's ineffectiveness during sentencing, defendant must establish that but for trial counsel's failure to present certain mitigating evidence, defendant would have received a lighter sentence." *Tuduj*, 2014 IL App (1st) 092536, ¶ 102. We do not need to evaluate whether counsel's performance was deficient if we determine that the defendant cannot show prejudice. *People v. Hale*, 2013 IL 113140, ¶ 17. The standard of review for determining whether the defendant received ineffective assistance of counsel is *de novo*. *Hale*, 2013 IL 113140, ¶ 15.

¶ 57    The defendant claims that defense counsel was ineffective for failing to impeach Albright with a video recorded statement of Albright claiming that the defendant had nothing to do with the crime. Defense counsel wished to introduce the video through the testimony of Disroe rather than

confronting Albright during her testimony. However, Disroe did not testify, and Albright's video statement was never admitted into evidence.

¶ 58    We first address and grant the defendant's motion to cite additional authority. Therefore, we consider *People v. Ford*, 2025 IL App (1st) 231679, ¶ 72, which addressed the impeachment of a witness with a prior statement captured on an officer's body-camera where several witnesses gave conflicting testimony.

¶ 59    In general, "out-of-court statements are considered inadmissible hearsay when offered to prove the truth of the matter asserted." *Ford*, 2025 IL App (1st) 231679, ¶ 50. An out-of-court statement by a witness may properly impeach in-court testimony if the out-of-court statement is inconsistent with the witness's testimony. *Ford*, 2025 IL App (1st) 231679, ¶ 50.

¶ 60    In *Ford*, body-camera footage was not admitted into evidence where the circuit court determined that a bystander's statement to law enforcement was consistent with his trial testimony. *Ford*, 2025 IL App (1st) 231679, ¶ 51. On review, the testimony of the bystander was found to be critical, and the body-camera video would have provided a different perspective. *Ford*, 2025 IL App (1st) 231679, ¶ 72. *Ford* found that there was a reasonable probability that the jury would have given less weight to the bystander's testimony and found him less credible, had the video of his statement to law enforcement been admitted into evidence. *Ford*, 2025 IL App (1st) 231679, ¶ 3.

¶ 61    In this case, the defendant argues that defense counsel was ineffective for failing to introduce a video of Albright opining that the defendant was not criminally liable. Unlike *Ford*, the jury here would not have received a different perspective of the events of the incident through Albright's video. See *Ford*, 2025 IL App (1st) 231679, ¶ 72. Albright provided no explanation of

17

what had actually occurred. Rather, in the short video, Albright merely agreed that the defendant did not commit a crime as he had only given someone a ride.

¶ 62    The video was not contrary to Albright's testimony. At trial, Albright testified that Harris was the person who struck her face with the bat. She never claimed that the defendant hit her. She did, however, identify the defendant as being present. This testimony was consistent with the video where she agreed that the defendant had given Harris a ride.

¶ 63    Additionally, "lay witness testimony is especially improper and prejudicial when it goes to the ultimate question of fact that is to be decided by the jury." *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001). Albright's opinion on whether the defendant committed a crime is inadmissible.

¶ 64    The defendant's guilt was based on a theory of accountability. The evidence of the defendant's participation in the crimes was overwhelming. All of the witnesses placed the defendant inside of Harrington's house with a baseball bat, and Payne testified that the defendant had rifled through her pants pockets for money. Littlefield identified that the defendant was with Harris and that the defendant was the driver. Schnicker also saw two men with bats exit the house. Furthermore, Kelley testified that the defendant admitted that he went to the home with Harris and was present during the incident. The defendant has not demonstrated prejudice or that defense counsel was ineffective regarding the cross-examination of Albright.

¶ 65    The defendant also claims that defense counsel was ineffective for failing to elicit testimony that Albright and Payne had stolen money from Harris. Defense counsel, however, questioned Littlefield regarding whether Harris was having an issue with his bank card. On the same day as the incident, Littlefield attempted to contact Harris's bank to determine whether Harris had money in his account. Later in the evening, Harris and the defendant went back to Harrington's house with baseball bats and searched Albright and Payne's pockets for money. The defendant and

18

Harris blamed Littlefield by saying that "you did this" before they left Harrington's house, and that Harris had also searched Littlefield's purse for his missing money. The defense had elicited testimony alluding to an issue with Harris's bank account and that Harris was looking for money.

¶ 66 Defense counsel's decision regarding the cross-examination of Albright and Payne were matters of trial strategy and the defendant has not demonstrated ineffective assistance of counsel. Additionally, the defendant was not prejudiced by defense counsel's decision not to ask the victims if they had stolen money from Harris. The evidence revealed that the defendant was armed with his own baseball bat when the two men entered the home and the defendant removed items from two women after they were injured. Harris's belief that Albright or Payne had stolen his money would not have lessened the defendant's liability.

¶ 67 The defendant also argues that defense counsel was ineffective at sentencing for failing to argue factors in mitigation. Defense counsel's failure to present mitigating evidence does not itself establish ineffective assistance where an adequate investigation has been conducted. *People v. Ruiz*, 177 Ill. 2d 368, 385 (1997). "Although courts are highly deferential in reviewing counsel's strategic decisions whether to present certain mitigating evidence, such deference is not warranted where the lack of mitigation evidence presented stems not from strategy, but from counsel's failure to properly investigate and prepare the defense." *People v. Thompkins*, 191 Ill. 2d 438, 469-70 (2000).

¶ 68 The defendant claims that defense counsel was ineffective for failing to argue that imprisonment would have endangered his medical condition (730 ILCS 5/5-5-3.1(2) (West 2022)) and that the defendant led a law-abiding life for a substantial period of time (730 ILCS 5/5-5-3.1(7) (West 2022)). The PSI indicated that the defendant was in remission for cancer, and he was in an acceptable state of physical health. The defendant's felony convictions had also been addressed

19

during sentencing where the parties discussed his criminal background. The circuit court indicated that it was familiar with the PSI by commenting that it had reviewed it "more than once." The circuit court reviewed the defendant's criminal background in the PSI again when defense counsel clarified that the defendant did not have a previous armed robbery conviction as argued by the State.

¶ 69 Defense counsel additionally argued that the defendant was 65 years old; Harris had attacked the sleeping occupants of the home before he could be stopped; and the defendant did not personally cause injury, rather he was careful when he had searched the victims. Defense counsel advocated for the minimum sentence on each count and requested that they run concurrently for a total of six years in the IDOC.

¶ 70 The circuit court specifically stated that it had considered the factors in mitigation and found none. The defendant's age and criminal history were considered by the circuit court. The defendant's health history was included in the PSI, which had indicated that the defendant's health was "acceptable." The circuit court placed weight on the necessity to protect the public and the defendant's lengthy criminal record when considering issuing a lengthy sentence. An adequate investigation was conducted. The defendant has not established that but for defense counsel's failure to present certain mitigating evidence, the defendant would have received a lighter sentence. Thus, the defendant has not established ineffective assistance of defense counsel during trial or during sentencing.

¶ 71 The defendant additionally argues that the defendant's armed violence convictions should be vacated under the one-act, one-crime rule where the defendant was convicted of home invasion. The defendant acknowledges that this issue was not preserved for appeal and seeks plain-error review. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when

20

(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Forfeited one-act, one-crime arguments qualify for review under the second prong of the plain-error rule. *People v. Artis*, 232 Ill. 2d 156, 165 (2009).

¶ 72    Under the one-act, one-crime rule, " 'a defendant may not be convicted of multiple offenses that are based upon precisely the same single physical act.' " *People v. Woods*, 2018 IL App (1st) 153323, ¶ 42 (quoting *People v. Johnson*, 237 Ill. 2d 81, 97 (2010)). We apply a two-step analysis in determining whether a violation of the one-act, one-crime rule occurred. *People v. Coats*, 2018 IL 121926, ¶ 12. The first step determines whether the defendant's conduct consists of a single physical act. *Coats*, 2018 IL 121926, ¶ 12. If the defendant committed multiple acts, then we apply the second step and determine whether any of the offenses are lesser-included offenses. *Coats*, 2018 IL 121926, ¶ 12. Multiple convictions are proper if none of the offenses are lesser-included offenses. *Coats*, 2018 IL 121926, ¶ 12. Whether the one-act, one-crime rule is applicable is a question of law which we review *de novo*. *People v. Span*, 2011 IL App (1st) 083037, ¶ 79.

¶ 73    "[T]o be a lesser included offense, the greater offense must include *every element* in the lesser offense plus one or more elements; the lesser offense cannot have any element that is not included in the greater one." (Emphasis in original.) *People v. Hawkins*, 125 Ill. App. 3d 520, 522 (1984). "In other words, it is impossible to commit the greater offense without necessarily committing the lesser also." *Hawkins*, 125 Ill. App. 3d at 522.

21

¶ 74    The defendant was charged with home invasion for entering Harrington's dwelling knowing that people were present and "intentionally cause[d] any injury" to Albright and Payne while inside the dwelling. See 720 ILCS 5/19-6(a)(2) (West 2018). In comparison, the defendant was charged with two counts of armed violence for injury caused to two different individuals while armed with a category III weapon, a bludgeon. The armed violence charges require a finding that the defendant "cause[d] great bodily harm or permanent disability or disfigurement." 720 ILCS 5/12-3.05(a)(1) (West 2018). The armed violence charges do not contain the same elements as the home invasion charge. Furthermore, there were two separate victims and therefore two separate acts that qualified for the armed violence charges. Those charges are not merged under the one-act, one-crime rule.

¶ 75                                III. CONCLUSION

¶ 76    For the foregoing reasons, the judgment of the circuit court of Jefferson County is affirmed.


¶ 77    Affirmed.